[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 843 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 844 
The appellant, Ulysses Charles Sneed, was indicted jointly with John Milton Hardy on October 22, 1993, in Morgan County, for the capital offense of murder committed during a robbery in the first degree. See Ala. Code 1975, § 13A-5-40(a)(2). (For the particular facts of Hardy's prosecution, see Hardy v. State, [Ms. CR-95-0589, March 26, 1999] ___ So.2d ___ (Ala.Crim.App. 1999).
At arraignment, Sneed pleaded not guilty and not guilty by reason of mental disease or defect. At the conclusion of opening statements at trial, he withdrew his plea of not guilty by reason of mental disease or defect. On October 27, 1995, after a joint trial, a jury found Sneed guilty of the capital offense charged in the indictment. On October 30, 1995, after a joint sentencing hearing before the jury, § 13A-5-46, the jury recommended, by a vote of 10 to 2, that Sneed be sentenced to death. On December 21, 1995, the trial court held another joint sentencing hearing, §13A-5-47, and heard testimony and arguments concerning information in the presentence investigation report and the existence of aggravating circumstances and mitigating circumstances. Thereafter, the trial court determined that two aggravating circumstances existed in specific regard to Sneed: (1) that the murder was committed during the course of a robbery, § 13A-5-49(4); and (2) that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses, §13A-5-49(8). The court determined that three statutory mitigating circumstances existed: (1) that Sneed had no significant history of prior criminal activity, § 13A-5-51(1); (2) Sneed was an accomplice in the capital offense committed by Hardy, §13A-5-51(4);[1] and (3) Sneed's age (23 years old) at the time of the crime, § 13A-5-51(7). The court further determined that two nonstatutory mitigating circumstances existed: (1) Sneed had a family, i.e, three children, three siblings, and his mother, by whom he was primarily raised; and (2) Sneed's character and his remorsefulness for the murder. Based upon the evidence presented at trial, the evidence presented during the sentencing hearings, the presentence investigation report, the recommendation of the jury, and its finding that *Page 845 
the aggravating circumstances outweighed the mitigating circumstances, the trial court sentenced Sneed to death. See § 13A-5-47.
The state's evidence tended to show the following: In the early morning hours of September 7, 1993, Clarence Nugene Terry, the clerk at Bud's Convenience Store, located in Decatur, was robbed and murdered. A surveillance camera recovered at the scene captured the robbery-murder on videotape. The videotape showed Hardy and Sneed entering the store. Hardy was armed with a gun. Immediately upon entering the store, Hardy began firing at Terry. As Hardy fired the initial shot, Sneed walked past Hardy toward the cash registers. The first shot missed Terry, and he ran behind the counter. Sneed, by this time also behind the counter, tried to open the cash registers as Terry lay on the floor near his feet. As Sneed attempted to open the cash registers, Hardy leaned over the counter and shot Terry in the chest. Terry tried to protect and hide himself after he was shot in the chest. Hardy walked around the counter and fired five shots into Terry's face and head. Forensic evidence showed that Terry was still conscious when Hardy began shooting him in the head. Terry suffered gunshot wounds to the left cheek, left upper cheek, center of his forehead, left ear, left eye socket, right side of his chest, and the palm of his right hand. Any of the wounds to the head or the one to the chest would have proved fatal. As Terry lay dying on the floor, Sneed and Hardy continued attempted to open the cash registers. Sneed, at one point, kicked Terry's foot to move it out of his way. The attempts to open the cash registers were unsuccessful, so Hardy and Sneed unplugged one of the cash registers and took it with them when they ran out of the store.
The state's evidence further showed that on August 29, 1993, a few days before the robbery-murder, Sneed and Christopher Hines drove Hines's blue 1978 Ford automobile from Louisville, Kentucky, to Tanner, Alabama, to visit Hines's relatives. Sometime after arriving in Tanner, the two men met Hardy. On the evening of September 6, 1993 (the evening before the early-morning crime), Sneed, Hardy, and Hines rode in someone else's automobile to Tennessee to purchase fireworks and beer. They returned to Alabama, where they spent the remainder of the evening drinking. Around 10:30 p.m., Hines let Hardy borrow his automobile; Sneed left with Hardy. Hines did not see either Sneed or Hardy until around 3:00 or 4:00 a.m. the next morning, when he accompanied them to a location near Hardy's father's house, where, using a sledgehammer, the three men attempted to get money out of a cash register. Subsequently, the cash register was recovered and Hines's fingerprint was later found on a piece of it.
The state's evidence also showed that police officers showed the surveillance videotape of the robbery-murder to several persons, including Hines, in an effort to identify the gunman and his accomplice. Hines and three others positively identified Hardy as the shooter. Hines and a law enforcement officer identified Sneed as the unarmed perpetrator in the videotape. On Wednesday, September 8, 1993, Sneed, Hardy, and Hines traveled to Louisville, Kentucky, and Sneed was arrested the same day. Sneed gave a statement to the Decatur police officers, in which he admitted participating in the robbery, but stated that he did not intend for anyone to get hurt. His defense at trial was that he participated in the robbery, but not the murder; that he was one of the people in the videotape, but not the gunman; and that he did not intend for anyone to be killed. He called no witnesses in his defense and did not testify himself. Rather, his defense was presented by his counsel *Page 846 
through argument and cross-examination of the state's witnesses. He does not question the sufficiency of the state's evidence to support his conviction. Nevertheless, after reviewing the record, we conclude that there was sufficient evidence presented by the state from which the jury, by fair inference, could exclude every reasonable hypothesis except that of guilt and find him guilty beyond a reasonable doubt of the capital offense charged in the indictment, murder committed during the course of a robbery in the first degree. In fact, the evidence of guilt of the capital offense was strong and convincing.
On appeal, Sneed raises 14 issues in his brief. Most of those issues are virtually identical to issues raised by Sneed's co-defendant, Hardy, in Hardy v. State. Where those issues are the same in all material respects, we will not address them further in this opinion. We adopt our holdings in Hardy, by reference, in regard to those issues.
 I.
Sneed contends that the "joinder of [his] trial with Hardy's, over [his] objection, violated [his] federal and state constitutional rights." (Brief p. 6.) He argues that the trial court erroneously admitted into evidence a redacted version of his post-arrest inculpatory statement, which, he says, "distorted the facts of the case and enlarged [his] role in the offense." (Brief p. 6.) He further argues that the admission of the redacted statement "hampered his ability to put on his defense," "violated the rule of completeness," and "unlawfully limited [his] right to cross-examination." (Brief, pp. 7, 10, and 12.) He does not argue on appeal that being indicted jointly with Hardy was improper, but that the joinder became improper when the redacted statement was admitted into evidence. He contends that the trial court committed reversible error when it overruled his motions for a severance based on the prejudice caused by the alleged erroneous admission of the redacted statement. He did not file a pretrial motion for a severance, but moved unsuccessfully for a severance several times during his trial.
The joint indictment of Sneed and Hardy was proper because two or more defendants may be charged in the same indictment if they are alleged to have participated in the same act or transaction. Ala.R.Crim.P. 13.3(b) (1). Here, Sneed and Hardy were charged with participating in the same act. Defendants joined in the same indictment shall be jointly tried unless severed as provided in Rule 13.4. If it appears that a defendant is prejudiced by such a joinder, the trial court may grant a severance or provide whatever other relief justice requires. Rule 13.4(a). The rule makes no distinction between capital and noncapital offenses. See Rogers v. State, 630 So.2d 78
(Ala.Crim.App. 1991), rev'd, 630 So.2d 88 (Ala. 1992), aff'd on remand sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Crim.App. 1992), aff'd, 638 So.2d 1360 (Ala. 1993), cert. denied, 513 U.S. 845,115 S.Ct. 136 (1994); Hinton v. State, 548 So.2d 547
(Ala.Crim.App. 1988), aff'd, 548 So.2d 562 (Ala.), cert. denied,493 U.S. 969 (1989). The Alabama rule pertaining to joinder and severance is taken from the federal rule. Fed.R.Crim.P. 14. See also Hinton v. State, 548 So.2d at 555.
Weighing against severance is a preference for joint trials where joint crimes are involved. Zafiro v. United States,506 U.S. 534 (1993). The United States Supreme Court stated the policy in Richardson v. Marsh, 481 U.S. 200, 210 (1987), as follows:
 "It would impair both the efficiency and the fairness of the criminal justice system *Page 847 
to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability — advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."
(Footnotes omitted.)
In Hill v. State, 481 So.2d 419, 424 (Ala.Crim.App. 1985), we stated:
 "The decision whether to grant a severance, or order a joinder of defendants, lies within the broad discretion of the trial court. This Court will not overturn that decision absent an abuse of discretion. United States v. Webster, 734 F.2d 1048, 1052 (5th Cir.), cert. denied sub nom., Hoskins v. United States, 469 U.S. 1073 . . . (1984). `In order to establish an abuse of discretion, the defendant must show that he "received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection." See U.S. v. Berkowitz, 662 F.2d [1127] at 1132 [(5th Cir. 1981)].' [United States v.] Webster, 734 F.2d [1048] at 1052 [(5th Cir.), cert. denied, 469 U.S. 1073
(1984)]."
A defendant seeking to overturn the denial of a motion for severance has the burden of demonstrating specific and compelling prejudice that the trial court cannot protect against and that causes his trial to be unfair. It must be demonstrated that the prejudice is specific and that it resulted from the denial. A demonstration of some prejudice is insufficient. Minnis v. State,690 So.2d 521 (Ala.Crim.App. 1996). In order to justify a severance, a defendant must show before or during the trial that there was a serious risk that his rights would be compromised, or that severance was necessary for the jury to make a reliable judgment. Zafiro v. United States.
In Bruton v. United States, 391 U.S. 123 (1968), the United States Supreme Court held that admission of the confession of a nontestifying defendant, implicating his codefendant in the crime, violated the codefendant's rights under the Confrontation Clause of the Sixth Amendment, notwithstanding any cautionary instructions to the jury. Id. at 136. In Richardson v. Marsh, however, the Supreme Court held that the admission of a nontestifying defendant's confession does not violate the Confrontation Clause where the confession is redacted to eliminate the codefendant's name and any reference to him and the court gives the jury a proper limiting instruction.
In the instant case, the state offered into evidence a redacted version of Sneed's statement in order to avoid violating Hardy's Sixth Amendment confrontation rights. The redacted statement was admitted into evidence over Sneed's objection. Sneed argues that by eliminating all references to Hardy in the statement and by substituting the pronoun "I" for "we" or "he" whenever they appeared in the statement the redacted statement distorted the meaning of his statement, distorted the facts of the case, enlarged his role in the crime, made it appear that he was primarily responsible for planning and executing *Page 848 
the crime, and effectively nullified his defense that he lacked the specific intent to commit murder. He argues that this redaction erroneously made him appear to be the primary actor in the commission of the offense. Sneed did not testify at his trial or call any witnesses in his behalf at the guilt phase of his trial. He relied on the cross-examination of the state's witnesses and arguments of his counsel to present his defense. His defense against the capital charge consisted of a denial that he had committed intentional murder, while admitting his guilt to robbery in the first degree and to felony murder. He argued that even though he willingly participated in the robbery, he did not shoot the victim and he did not intend that anyone be shot or killed in carrying out the robbery. He states in his brief, "Mr. Sneed thought Mr. Hardy meant that they would strongarm a convenience store, or in other words, demand money without deadly force." (Brief, p. 2.) He argues on appeal that the language redacted from the statement eliminating all references to Hardy and to Hardy's actions in conceiving, planing, and carrying out the robbery, including the shooting of the victim, denied him a fair trial, in that it hampered his ability to present his defense, violated the rule of completeness, and unlawfully limited his right of cross-examination of the state's witnesses.
Clearly, Sneed's original statement was changed considerably by the redaction. While Sneed had an interest in having his complete original statement presented to the jury, the trial court had concurrent obligations both to protect the interests of the codefendant, Hardy, who would have been implicated by the admission into evidence of Sneed's complete statement, and to consider the interests of judicial economy that are advanced by joint trials. In deciding whether to redact portions of a defendant's statement, a trial court balances the interest in protecting a codefendant's confrontation right against the judicial economy achieved by a joint trial. See United States v.Castro, 813 F.2d 571 (2d Cir.), cert. denied, 484 U.S. 844 (1987);United States v. Mussleen, 35 F.3d 692 (1994). We review the trial court's balancing of these competing interests under an abuse-of-discretion standard. United States v. Mussleen; UnitedStates v. Castro; United States v. Weisman, 624 F.2d 1118 (2d Cir.), cert. denied, 449 U.S. 871 (1980). In a case similar to this case, United States v. Castro, the court upheld a conviction despite the defendant's claims that he was prejudiced by the admission of testimony in the form of his statements with his codefendant's name redacted. The defendant had shown federal agents the location of cocaine in a black plastic bag, adding that the bag belonged to his codefendant, who had put it there. The testimony at trial described those statements without any mention of the codefendant, but noting that the defendant had in substance denied ownership of the bag and its contents. The court held:
 "While Castro had an interest in having his statement presented in context, the court had concurrent obligations both to protect the interest of the co-defendant Pozo (Acosta), who could have been implicated by Castro's full statement, and to consider the interests of judicial economy, which are advanced by a joint trial. By suggesting that the government on direct, and Castro on cross-examination, elicit from Officer Figueroa the essential point Castro wanted to present to the jury, i.e., that Castro `in substance' denied ownership of the cocaine, the court reasonably accommodated these competing interests. The gist of Castro's statement was presented without unduly prejudicing either the right of Pozo to avoid being implicated *Page 849 
by a co-defendant's out-of-court statement, or the right of Castro to have his conduct and statement presented in context. We cannot conclude that this approach was an abuse of discretion. In any event, any error was harmless.
 "As a general proposition, an error with respect to admission of evidence will result in reversal of a conviction if it had `substantial and injurious effect or influence in determining the jury's verdict.' Kotteakos v. United States, 328 U.S. 750, 776 (1946); see United States v. Teitler, 802 F.2d 606, 616 (2nd Cir. 1977). However, if the evidence against the defendant is overwhelming, and the prejudice resulting from the error is relatively insignificant, the error is likely to have been harmless. See Teitler, 802 F.2d at 616-17."
813 F.2d at 576-77. See also United States v. Mussaleen, 35 F.3d at 696-97 (holding no error where contested portion of redacted statement reached the jury through the testimony of witnesses);United States v. Lopez, 898 F.2d 1505, 1510 n. 10 (11th Cir. 1990). In the instant case, the gist of what Sneed claims was improperly redacted from his statement was presented to the jury through testimony of other witnesses, through demonstrative evidence, and through facts elicited on cross-examination. The trial court was very lenient in permitting Sneed to cross-examine the state's witnesses, obviously to allow him to present his defense to the jury. His defense — that he did not act alone, did not acquire or carry the weapon, did not intend for anyone to get hurt, did not shoot the victim, and did not possess the requisite intent to be found guilty of murder — was clearly before the jury. The substance of Sneed's statement was presented without unduly prejudicing either Hardy's right to avoid being implicated by Sneed's out-of-court statement or Sneed's right to have his conduct and statement presented in context.
The videotape from the surveillance camera shows that two men were involved in the commission of the crime and that Sneed was not the triggerman. Sneed in cross-examination of Officer Boyd and Officer Hale brought out that the redacted statement admitted in evidence was not Sneed's entire statement and that the original statement contained more details; that Sneed stated in giving his statement when questioned that he never intended for anyone to get hurt and had no part in the killing; that he stated that he was unarmed and never fired a weapon; and that the officers had no evidence that he ever fired a weapon; that he did not acquire the weapon; that it was not his idea to burn the clothes; and he stated that the sleeve he used for a mask was given to him.
Hale testified that Hardy borrowed the automobile from Hines; that Hardy admitted borrowing the automobile, hiding the weapon, and burning the clothes; and he identified the shooter in the videotape as Hardy. Hines testified that Hardy had borrowed his automobile; that Hardy and his father got in an argument about a missing gun; and he identified Hardy and Sneed as the two men depicted in the videotape, and he identified Hardy as the triggerman. In addition, Sneed's counsel presented his defense clearly and forcefully in his summation to the jury in the guilt-phase of the trial. He stated:
 "But sometimes things happen and it makes it even more important and appropriate for you people to make the right decision in this case as to the culpability of either of these defendants, because there's a significant difference in the culpability of these people.
 "State's Exhibit 69 [the redacted statement], and what I want you to do — you'll *Page 850 
have this available to you to examine. What I want you to do is I want you to read this statement. Will each of you promise you will at least read the statement? Will you do that for me?
 "Now, when you read the statement, don't just read it for its contents, juxtapose the statement against the video that you've all seen. I suggest to you and I'm sure Judge Brown will tell you, that if you want to see the video again you're going to be allowed to do that. When you think about the video and you think about what's said in here, I want each of you, every one of you, to ask yourselves this question: `What is not said in this statement?' Because everything in this statement is the truth except with regards to whoever else is in that video.
 "I'm not going to get into the rules of procedure and the rules of evidence that require it to be done this way, but obviously the Court endorsed this statement. What I want you to do is think about the video and read this statement and ask yourselves questions like this. `I forgot to say that after I drove by the first time I stopped and took the sleeves off a shirt.' Not my shirt. Off a shirt.
 "Well, whose shirt was it? Was there only one person in this video? No. Did y'all see more than one person come into the store on the video? You did, didn't you? They can argue all they want to [that] it wasn't their client, but you did see another person come in there. When he's being interviewed, he's trying to be truthful. He says, `By the way, I forgot to say that after I drove by the first time, I stopped to take the sleeves off a shirt.'
 "Well, it wasn't his shirt and we all know that. You all know that. `When I went by the store the second time, I stopped and I got out and I walked to the front door.' If you will remember that video, there wasn't just an `I' walking to the front door. There was a `we' walking to the front door. There were two people walking to the front door. Somebody is insulting your intelligence by saying that there's just one person walking to the door. You all saw two people walking to the door.
 "You also saw that when my client walked in, the other person in the video, the first thing he does is he raises that .22 rifle and points it at the clerk. It's obvious Mr. Terry is defenseless. He's unarmed. He doesn't even have a place to run. After the first shot, he goes and he falls down behind the counter and begs for his life and you know that my client didn't do anything to cause that."
". . . .
 ". . . They all told you that wasn't all of his statement [redacted statement], that he said a lot of other things in his statement.
 "I expect the Judge is going to charge you when she charges you, that you can give as much weight to the things that I elicited on cross-examination about his statement in Kentucky, as you do the one read to you by the police department. There's a reason why people object to things and why parts come in here and parts come in there. It doesn't mean that one part of it is more — what they put in is any more important than what I have to say.
 "There's a statement. You know there's another statement. You know there's a statement that's more detailed than the one you heard from the State of Alabama, and it may not be his fault It's not his fault it didn't all come in. But you know that there's one more detailed than that.
 "And you know in that statement he didn't tell anybody it was his rifle. Are we to conclude that it was somebody else's rifle? Obviously. And he didn't *Page 851 
tell them that he acquired that rifle so he could go rob somebody. Are we to conclude that somebody else did that? I had to ask him questions and it's difficult for me when the wind started blowing again, and I had to ask questions like, `Well, did my client tell you that he got that shirt sleeve or it was given to him?' It's hard for me to ask those questions but I think we got the gist of what was said, that somebody else obtained the shirt sleeve and used it for masks and gave it to my client.
 "I think it's obvious from those questions that I asked, that what Lieutenant Boyd said when he was in Kentucky, who took the gun when they left there, who did it, who disposed of it. It's pretty obvious to me that Charles Sneed — I call him Charles. Charles Sneed was not the one who masterminded this robbery or the murder of it."
And the trial court, obviously endeavoring to balance the rights of the defendants and ensure that Sneed's defense was presented to the jury, emphasized in its oral charge to the jury that the redacted statement admitted into evidence was not Sneed's entire statement, and that the jury should consider and could give as much weight to the statements attributed to Sneed that were brought out on cross-examination as it could give the redacted statement. The trial court, charged the jury, as follows:
 "I charge you, members of the jury, that State's Exhibit 69 [the redacted statement] as read to you is not the entire statement of Defendant Sneed, and that you can give as much weight to the statements of Defendant Sneed as elicited on cross-examination as [you] do to those in State's Exhibit 69."
Sneed also contends that the admission into evidence of the redacted statement denied him a fair trial because, he says, its admission violated the rule of completeness. In Alabama, the general rule of completeness is stated, as follows:
 "`If a part of a conversation is adduced in evidence by the state as proving the defendant's declarations or confessions of guilt, the defendant has the right to call for the whole of what was said in that conversation relative to the subject matter of the issue. Chamber[s] v. State, 26 Ala. 59
(1855); William v. State, 39 Ala. 532 (1865); Mullis v. State, 258 Ala. 309, 62 So.2d 451
(1953). The accused is entitled, on cross-examination, to bring out all that he said, at the same time and on the same subject. Parke v. State, 48 Ala. 266 (1872).
 "`However, the rule which frowns upon incomplete confessions is designed to cover cases where an accused, after admitting commission of the criminal act, is prevented from going further and saying anything which might explain or justify his act. William, supra; United States v. Wenzel, 311 F.2d 164 (4th Cir. 1962); see generally 29 Am.Jur.2d 586, Evidence, § 535.'
"King v. State, 355 So.2d 1148, 1151 (Ala.Cr.App. 1978). . . .
". . . .
 "`A confession should be considered in its entirety. If the state introduced into evidence only a portion of an alleged confession, a defendant is entitled to introduce the remainder of what was said to and by him, including any exculpatory statements which would bear upon the matter in controversy.'
"King v. State, supra, at 1151."
Bridges v. State, 516 So.2d 895, 898-99 (Ala.Crim.App. 1987).
When part of a defendant's post-arrest statement is introduced, the defendant *Page 852 
generally has the right to have the entire statement introduced. Courts have recognized, however, that in cases where a redacted version of a statement is necessary to protect the rights of a codefendant, the rule of completeness will be violated only when the statement in its edited form effectively distorts the meaning of the statement or excludes information exculpatory of the declarant. United States v. Smith,794 F.2d 1333, 1335 (8th Cir. 1986); United States v. Alvarado,882 F.2d 645 (2d Cir. 1989); United States v. Lopez,898 F.2d 1505, 1510 n. 11 (11th Cir. 1990).
While the admission of the redacted statement may have hindered to some extent Sneed's ability to present his defense, the hindrance was inconsequential because he was ultimately able to fully present those facts he deemed important in his defense. Initially the redacted statement appeared to violate the rule of completeness by distorting the statement and excluding exculpatory information. However, as the trial progressed, it became clear that no violation occurred because the jury had before it all the evidence supporting his defense, even though some of the information had not been included in the edited statement. Subsequent testimony cleared any distortion and supplied the exculpatory evidence. "The rule of completeness is not violated when the meaning of the redacted statement becomes clear despite the redaction." United States v. Long, 900 F.2d 1270, 1279 (8th Cir. 1990).
We do not agree with Sneed's assertion that he was unlawfully limited in his right of cross-examination.
Moreover, in this case, even if the admission of Sneed's redacted statement was erroneous, it would not mandate reversal; the evidence of guilt of the capital crime charged was so overwhelming that any error in this regard would have been harmless.[2] If error occurred, it could not have had an injurious effect or influence on the jury's verdict nor could it have injuriously affected Sneed's substantial rights.
We conclude that the trial court did not abuse its discretion in denying Sneed's motions to sever. He did not meet his burden by showing specific and compelling prejudice, against which the trial court was unable to afford protection, that would warrant a severance under the facts of this case. The trial court was well within its discretion in admitting Sneed's statement in redacted form. The ruling protected Hardy's right to confrontation of the witnesses against him and served the intent of judicial economy by allowing for a joint trial of two defendants whose alleged criminal *Page 853 
conduct arose from the same set of facts. We cannot conclude that the manner in which the trial court balanced the rights of the defendants and accommodated their competing interests was an abuse of discretion in this case. In any event, if error occurred, it was harmless.
 II.
Sneed contends that the trial court denied his constitutional right to an individualized sentencing by refusing to sever his penalty-phase hearing from that of Hardy. The basis of this contention is essentially that, under the circumstances here, the jury would be unable to give separate, personal consideration to the sentence of each individual defendant and to base each defendant's sentence on that defendant's own acts and statements, and the evidence applicable to him. He argues that the risk of prejudice by this joinder was too great to alleviate by jury instructions.
Section 13A-5-46(b) provides that the sentencing hearing in a death penalty case shall be conducted before the same jury that convicted the defendant, except in certain situations not present in this case. The same policy considerations that favor joint trials in the guilt phase also apply in the sentencing phase. SeeUnited States v. Tipton. See also Richardson v. Marsh; Lockhartv. McCree, 476 U.S. 162 (1986).
The Eighth Amendment requires an individualized sentencing determination in a death penalty case. Stringer v. Black,503 U.S. 222 (1992); Lockett v. Ohio, 438 U.S. 586 (1978). The record does not support Sneed's claim that a joint sentencing hearing made it impossible for the jury in this instance to render an individualized sentencing decision as to each defendant. This was not a case in which there was considerably more aggravating evidence against one defendant than against the other. Both defendants had been indicted and convicted of the same murder-robbery. The evidence of aggravating circumstances that the state presented at the sentencing hearing was identical as to each defendant. In addition, each defendant was given the opportunity to present, and presented, mitigating evidence relevant to his character and record.
Lee Brewer, a minister, testified at the sentencing hearing before the jury that he had counseled Sneed on a regular basis since Sneed had been in jail awaiting trial in this case; that Sneed was a good, an active, and an interested Bible student; that Sneed had accepted Christ as his savior and had been baptized in jail; that he believed that Sneed was sincere; and that, if given the opportunity, Sneed could make a difference in helping others with their lives in prison. Antoine Aycock, a minister, testified also. He testified that he had worked with Sneed and Brewer in jail, and that he believed that Sneed was sincere, and could do good and make a worthwhile contribution to the lives of others if given a chance. Brewer was recalled as a witness for Sneed at the sentencing hearing before the trial court. He further testified that he had continued to counsel Sneed since the trial; that Sneed had continued his Bible studies and had counseled other inmates; and that he believed that Sneed could make a positive impact on others if he were allowed to live. Also, a letter from an inmate in the jail was introduced into evidence, confirming and supporting Brewer's testimony.
Before, during, and after closing arguments, the trial court specifically instructed the jury to give separate consideration to each defendant. The jury was informed on each of those occasions that each defendant was entitled to have his sentence *Page 854 
decided based on the evidence and applicable law and that any evidence that was limited to only one defendant should not be considered as to the other defendant. In addition, counsel for the defendants, as well as the prosecutor, in their closing arguments, reiterated and emphasized the trial court's instructions in this regard. After closing arguments in the sentencing phase, the trial court instructed the jury as follows:
 "You have heard two separate sentencing hearings that were presented at the same time. As you listen to these instructions and as you deliberate, it is your duty to give separate personal consideration to the sentence of each individual defendant.
 "When you do so, you must analyze what the evidence shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against the other defendant.
 "Each defendant is entitled to have his sentence determined from his own acts, statements and other evidence in the case, which may be applicable to him."
(R. 3887-88.) Because there is nothing in the record to indicate the contrary, we presume that the jury understood and followed these instructions. See Richardson v. Marsh; United States v.Tipton. We find nothing in the record to suggest that the jury was unable to weigh the evidence separately, to separate the aggravating and mitigating factors applicable to each defendant, to consider and weigh them, and to render the individualized decision required. The evidence as to each defendant and the issues in the case were not complicated.
Thus, we find no abuse of discretion by the trial court in denying the motions for severance in the penalty phase and in conducting a joint penalty-phase trial in this case.
 III.
Sneed claims that the charging indictment is due to be dismissed and his conviction reversed because, he says, the method of selecting grand jury forepersons in Morgan County is racially discriminatory. Sneed's codefendant Hardy filed a pretrial motion seeking to dismiss the indictment, based in part upon this allegation. Sneed, however, raises this issue for the first time on appeal. Therefore, we review this contention pursuant to the plain error rule.
 "In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term `plain error' adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935 . . . (1985); Ex parte Womack, 435 So.2d 766
(Ala.), cert. denied, 464 U.S. 986 . . . (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050 . . . (1989). Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack."
Bush v. State, 695 So.2d 70, 87 (Ala.Crim.App. 1995), aff'd,695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418 (1997). "`[T]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" UnitedStates v. Young, 470 U.S. 1, 15 . . . (1985), quoting *Page 855 United States v. Frady, 456 U.S. 152, 163 . . . (1982)."Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115
(1995).
The trial court held a hearing on Hardy's motion to dismiss the indictment and found that no prima facie case of discrimination had been established. We affirmed the trial court's ruling in this regard in Part III of our opinion in Hardy, ___ So.2d at ___. Certainly, on this basis, we find no plain error in regard to Sneed.
 IV.
Sneed contends that the trial court erred in allowing Sergeants Boyd and Hale to identify Sneed as the unarmed perpetrator depicted in the store's surveillance videotape. Boyd did not identify, before the jury, any participant depicted in the videotape. Thus, we address the admission of only Hale's identification.
In concluding that Sneed was the unarmed person depicted in the videotape, Hale testified that Sneed gave information at booking that he was 6 feet, 1 inch in height and that he weighed 275 pounds; that Sneed appeared to actually be a little heavier than that; that he spent 3 or more hours with Sneed when he interviewed him in Kentucky within a week of the crime; that he spent additional time with Sneed after Sneed was returned to Alabama; and that after viewing the videotape during the interview in Kentucky, Sneed admitted that he was the participant depicted in the videotape carrying the cash register. We further note that Sergeant Stine, an employee with the Jefferson County, Kentucky, police department, testified that Sneed had lost "a considerable amount of weight" between his arrest and his trial. (R. 2598.) In addition, Boyd testified that Sneed appeared substantially different at trial than he did when arrested; that, in his estimation, at arrest Sneed weighed close to 300 pounds; and that, at trial, Sneed had had "a substantial weight reduction." (R. 2878.)
We find, based on the principles and factors discussed in Part V in our opinion in Hardy, ___ So.2d at ___, that Hale's identification of Sneed was properly admitted: Hale testified to facts that were within his personal knowledge, and he was in a better position than the jury to draw the inference of identity from the facts. See Ex parte Reiber, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995 (1995). Unlike the jury, Hale was familiar with Sneed's appearance shortly after the robbery-murder; Sneed had disguised his appearance at the time of the offense; and his appearance was significantly altered prior to trial. (We note that this latter factor was not present in regard to the identification of Hardy.) See United States v. Pierce,136 F.3d 770 (11th Cir.), cert. denied, 525 U.S. 974, 119 S.Ct. 430 (1998).
Furthermore, we note that Hale's identification was cumulative of Hines's identification of Sneed as the unarmed person in the videotape. Hines testified that he and Sneed were "best friends"; that he had known him seven or eight years; that when they arrived in Alabama, they went places with Hardy; that he saw Sneed several hours before the crime and again several hours after the crime; and that he recognized Sneed in the videotape when he viewed it several days after the crime. Hines's familiarity was derived from a close relationship and substantial, sustained contact with Sneed; and he was most familiar with Sneed's appearance at the time the videotape was made because he saw Sneed within several hours before and after the offense was committed.
Finally, and perhaps most significantly, the issue whether Sneed was the unarmed person depicted in the videotape was not *Page 856 
seriously contested. Sneed's defense was that, although he robbed the victim, he had no intention of killing the victim or prior knowledge that the victim would be killed; in essence, he admitted his presence as the unarmed perpetrator.
 V.
Sneed contends that the prosecutor engaged in misconduct that deprived him of a fundamentally fair trial, due process, and a reliable sentence as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, his rights under the Alabama Constitution, and his rights under state law. We have reviewed the following specific allegations and reject them for the same reasons we rejected these contentions in regard to Sneed's codefendant Hardy, in Part VII of our opinion inHardy, ___ So.2d at ___.
 A.
The prosecutor misstated the law and thereby misled the jury when, after conceding the existence of the mitigating circumstance that both defendants had "no significant history of prior criminal activity," § 13A-5-51(1), he told the jury that the prosecution's position was that that was not a mitigating circumstance. (R. 3751.)
 B.
The prosecutor improperly expressed his personal opinions about the evidence and Sneed's guilt (1) when he told the jury, in his closing argument in the penalty phase, "I feel like we've shown you what we told you we were going to show. I'm going to ask you to [sentence Sneed and Hardy to death], and that's what I told you [I] was going to ask you at the beginning of the trial." (R. 3838); (2) when he commented, in his closing argument in the penalty phase, "We don't have to speculate about [Sneed's involvement in the crime]. You've got the best evidence in the world. You saw the crime happen. I've never been able to tell the jury that in my life." (R. 3866); and (3) when, after reading the indictment in his closing argument in the guilt phase, he told the jury that he had signed the indictment (R. 3561).
 C.
The prosecutor improperly twice read the indictment to the jury and stated that he had signed it (R. 2223-24, 3559-61), and the trial court also improperly read the indictment to the jury venire and noted that the district attorney had signed the indictment accompanying signature (R. 270-72).
 D.
The prosecutor shifted the burden of proof and created an unconstitutional presumption that death was the proper penalty when, after discussing the asserted nonstatutory mitigating circumstances and comparing them to the asserted aggravating circumstances, the prosecutor stated, "I submit to you that's not enough to overcome what you saw in that tape." (R. 3870.)
 E.
Sneed contends that the trial court erred in denying his motion for a severance made during the prosecutor's closing argument in the sentencing phase of the trial before the jury. He argues that the prosecutor improperly urged the jury to sentence him to death based on comments of Hardy's counsel made during the trial. The record shows that the prosecutor stated as follows:
 "I made some notes during the course of this trial about this case. These are quotes. `Shot in cold blood. A horrible crime was committed against an innocent victim. Terry dies a horrible unpleasant death. It was a terrible awful *Page 857 
thing.' My words? No. Those are Mr. Cauthen's [counsel for Hardy]."
(R. 3879-80.)
Sneed's trial counsel objected to the comments, and moved for a severance of the sentencing phase of the trial or in the alternative for instructions to the effect that the comments of Hardy's counsel in no way reflected how Sneed's counsel felt about the case. The record shows the following:
 "[I]n light of the fact that the District Attorney's last argument about comments made by defense counsel, particularly I think he referred to Mr. Cauthen and Mr. Madison and somebody begging for their life, worse crime, you heard what he said, we would request that our case be severed at this time for purposes of sentencing."
(R. 3881.)
The trial court ruled as follows:
 "I'll deny the severance, but I'll remind and instruct the jury that any statements made by counsel are not evidence and not to be considered — any statement or remarks of counsel on behalf of the state on their notes is not evidence and they should not reflect on the defendants in any manner."
(R. 3883.)
Shortly thereafter, the trial court gave the following instruction:
 "Ladies and gentlemen, before I begin my instructions, let me remind you of the instructions that I gave you earlier in the week.
 "Any comments or remarks or statements made by counsel are not evidence and cannot be used as evidence in this case. Likewise, any remarks that one attorney has used concerning the comments or remarks of another attorney, that is not evidence, nor can those remarks be taken or used or looked at against any of the other defendants, either of the defendants.
 "You have heard two separate sentencing hearings that were presented at the same time. As you listen to these instructions and as you deliberate, it is your duty to give separate personal consideration to the sentence of each individual defendant."
(R. 3886-87.)
We agree with the state, that the comments complained of, regardless of their origin, were accurate descriptions of the crime, and supported by facts in the record. We do not find the comments improper under the circumstances here; however, assuming for the sake of argument that they were improper, there still is no error, because the trial court was well within its discretion in denying the motion for a severance. This is especially so in view of the curative instructions specifically requested by Sneed as an alternative. We think the curative instructions cured any possible harm which may have been done by the comments. Jurors are presumed to follow their instructions, and in the absence of some evidence to the contrary, and we find none, we must presume that the jurors did so in this case. See Taylor v. State,666 So.2d 36 (Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120 (1996).
 F.
Sneed contends that the prosecutor's allegedly improper comments specified above, when looked at collectively, rendered his trial and sentencing unreliable and violated his rights to due process, a fair trial, and an impartial jury. We have reviewed each allegedly improper comment individually and have found no error warranting reversal. We have also reviewed the cumulative impact of the allegedly improper comments and still find no reversible error. *Page 858 
 VI.
Sneed claims that reversible error occurred because he was not present during part of an in camera hearing on the redaction of his statement and during the in camera questioning of a juror regarding that juror's request for two videotape recorders during deliberations. He contends that these absences violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution; Article 1, § 6, Alabama Constitution of 1901; Rule 9.1, Ala.R.Crim.P.; and Alabama caselaw.
We have reviewed the portions of the record relating to these two in-chambers hearings pursuant to the plain error rule because this issue is raised for the first time on appeal. In both instances, Sneed specifically waived his presence during these portions of the proceedings. In the first instance, the following occurred in regard to the discussion concerning his redacted statement:
 "[SNEED'S COUNSEL]: . . . Basically the same arguments were made before the chambers and after and we've adopted all of those arguments back and forth, but neither one of the defendants was present in your chambers. Certainly, Mr. Sneed wasn't. I don't intend to state for Mr. Hardy.
". . . .
 "We've talked to our client. He's aware of that. He waives his presence for that one brief hearing. I know it didn't take long. Basically, for the record, it was just a continuation of the arguments we made before. They were strictly legal arguments and his presence wouldn't have added to that hearing."
(R. 2733-35.) In the second instance, immediately before the in-chambers questioning of a juror, the following occurred:
 "[HARDY'S COUNSEL]: Defendant Hardy waives his right to be present during the questioning of juror [D.M.].
". . . .
 "[SNEED'S COUNSEL]: Charles, did you hear what [counsel] said?
"[SNEED]: Yes.
 "[SNEED'S COUNSEL]: You and I just spoke about that?
"[SNEED]: Yes.
 "[SNEED'S COUNSEL]: And you agree to waive your presence for that hearing?
"[SNEED]: Yes."
(R. 3660-61.) The two hearings were related to legal matters and were not related to Hardy's guilt or innocence, and his presence would not have benefited his defense. Burgess v. State,723 So.2d 742 (Ala.Crim.App. 1997) (no error occurs by capital defendant's absence from noncritical stages of trial if his presence would not have benefitted his defense). See also Harris v.State, 632 So.2d 503 (Ala.Crim.App. 1992). Sneed has not demonstrated that he suffered any prejudice as a result of his absence. We have reviewed and rejected this same contention in Part VIII of our opinion in Hardy, ___ So.2d at ___.
 VII.
Sneed contends that his statutory and constitutional rights and Alabama law were violated by the state's failure to comply with the discovery order of the trial court. He argues that the discovery violation adversely affected his ability to prepare his defense to such an extent that he is entitled to a reversal of his conviction. He relies on Brady v. Maryland, 373 U.S. 83 (1963);Ex parte Monk, 557 So.2d 832 (Ala. 1989); and Padgett v. State,668 So.2d 78 (Ala.Crim.App.), cert. denied, 668 So.2d 88 (Ala. 1995), to support his contention. Like codefendant Hardy, Sneed filed numerous *Page 859 
pretrial motions seeking the production of certain items and information from the state. The trial court granted broad and extensive discovery, beyond that required by Ala.R.Crim.P. 16.2, and in keeping with the open-file policy contemplated in Ex parte Monk. In fact, Sneed was granted and received practically everything he asked for except matters in the file that were the prosecutor's work product. Sneed specifically claims that the state violated the discovery order by failing to timely disclose its intent to call Steve Bernard and Tom Edwards as witnesses for the state, and by failing to produce the records they kept. He also claims that the trial court erred in denying his pretrial motion seeking the production of the criminal records, if any, of the law enforcement witnesses the prosecutor intended to call. He further claims that his conviction should be reversed because the grand jury that indicted him did not record the testimony of witnesses appearing before it. These identical issues were raised by codefendant Hardy on appeal. We addressed them at length in Part II of our opinion in that case, concluding that they were without merit. Hardy, ___ So.2d at ___. We find no discovery violation in this case, and we adopt our holding and reasoning on this issue in Hardy. Id.
 VIII.
Sneed asserts that the trial court's finding that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-49(8), was erroneous. He raises the same arguments that we rejected in Part X of our opinion in Hardy, ___ So.2d at ___. The trial court's findings in support of this aggravating circumstance, which follow, are supported by the evidence and are sufficient to support its finding of the aggravating circumstance. We concur in these findings.
 "The Court finds the State has proven beyond a reasonable doubt the offense was especially heinous, atrocious and cruel. This crime is set apart from other capital cases in that the crime was a conscienceless and pitiless crime and was unnecessarily torturous to the victim. Defendant Hardy shot and killed Clarence Nugene Terry while Defendant Sneed worked on trying to get the cash registers open. When the first shot was fired, the victim ran behind the counter and attempted to hide, rolling himself into a ball; however, defendant Hardy leaned over the counter and shot the victim in the chest. Mr. Terry lay on the floor immediately to the left of Sneed's feet. All the while Hardy was shooting, Sneed kept right on working to try and get the cash registers open as though nothing else was happening around him. After Hardy came around the counter and stood over the victim and shot at least five more times while the victim lay unarmed and helpless on the floor, defendant Sneed never stopped trying to get the cash registers open. Further, Mr. Terry did not die immediately after the first shot to his chest but lived for at least fifteen (15) seconds while Hardy continued to fire shots into his head. After Hardy finished shooting Mr. Terry, Defendant Sneed kicked the victim's foot out of the way in order to gain easier access to the second cash register.
 "In addition, the jury concluded that Defendant Sneed had the specific, particularized intent that Clarence Nugene Terry be killed during the course of the robbery thereby making Sneed legally accountable for the murder under accomplice liability even though Sneed did not personally commit the act of murder. Therefore, the aggravating circumstance in Section 13A-5-49(8), Code of Alabama, does exist and is considered by *Page 860 
the court in determining the appropriate sentence to impose in this case."
(CR. 151-52.)
In Issue VIII of his brief to this court, Sneed also contends — without any supporting argument — that the trial court erred in finding the existence of the aggravating circumstance that the capital offense was committed while Sneed and his accomplice were engaged in the commission of a robbery, § 13A-5-49(4). As the trial court noted in its sentencing order, not only did the jury's verdicts of guilty and the evidence establish this circumstance, but "[b]oth defendants, through counsel, admitted that murder during the course of a robbery is a statutory aggravating circumstance." (CR. 144-45.) See also § 13A-5-45(e) ("any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing").
 IX.
Sneed contends that the trial court erred in failing to conduct individually sequestered voir dire of the jury venire to determine whether any veniremember's impartiality had been affected by pretrial publicity. We have reviewed and rejected this same contention in Part XI of our opinion in Hardy, ___ So.2d at ___.
 X.
In a one-page argument addressing Issue X in his brief to this Court, Sneed contends that the trial court erroneously denied his motion for a change of venue. He argues the same points asserted by Hardy, but adds that "[t]he victim's relatives or friends apparently made comments to the media about the defendants. CR. 62." (Brief, p. 46.) He rests this unsubstantiated assertion on his unsworn pretrial motion seeking a "gag" order filed, wherein he generally asserted that following his arraignment, the victim's relatives and friends made comments to the newspaper media.
The trial court conditionally denied Sneed's motion for a change of venue, with leave to renew it "based upon voir dire." (C.R. 108.) (As was Hardy's motion, Sneed's motion was not made on oath, as required by Rule 10.1(c).) Sneed renewed his motion after the parties exercised their peremptory strikes, basing it on "all of the evidence that came forth in the voir dire examination" (R. 2076-77), and the trial court denied the motion.
We find, under the principles iterated in Part XII of our opinion in Hardy, ___ So.2d at ___, that Sneed's unsworn motion is procedurally defective; that Sneed did not introduce any evidence of any pretrial media coverage, much less substantial prejudicial publicity; that, therefore, he has not shown that the media coverage saturated the community with prejudicial publicity; that a review of the cited pages from the record does not support Sneed's assertion that he was actually prejudiced by the pretrial publicity; and finally that the trial court did not abuse its discretion in denying Sneed's motion for a change of venue. (In so holding, we have rejected Sneed's argument that he met his burden of proof with "evidence" that "the victim's relatives and friends apparently made comments to the media about the defendants.)
 XI.
Sneed next contends that the qualified venire from which his jury was drawn was impermissibly small. This argument is based on his asserted premise that Ala.R.Crim.P. 18.4, which sets out the procedure for selecting a jury, is silent on the number of veniremembers to be added to the venire for each additional defendant tried in a joint capital trial. We have *Page 861 
reviewed and rejected this same contention in Part XIII of our opinion in Hardy, ___ So.2d at ___.
 XII.
Sneed claims that, during the sentencing phase of his trial, his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated by the prosecution's reliance upon the robbery as an element of capital murder and as an aggravating circumstance. He argues that as a result of thid "double counting" of robbery, he was subjected to two punishments. This practice of double counting has been upheld. See Part XIV of our opinion in Hardy, ___ So.2d at ___.
 XIII.
Sneed contends Alabama's manner of execution — electrocution — constitutes cruel and unusual punishment in violation of the Eighth Amendment. We reviewed and rejected this contention on many occasions. See our discussion in Part XV of our opinion inHardy, ___ So.2d at ___.
 XIV.
Sneed contends that the cumulative effect of the alleged errors enumerated in his brief to this court was to violate his rights to due process and to a fair trial under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, and that he is therefore entitled to a new trial. We do not agree. We have reviewed each and every allegation of error and have found no error. We have also reviewed all of his alleged errors collectively, and still find no error or violation of Sneed's rights.
 XVII.
In accordance with Ala.R.App.P. 45A, we have examined the record in this case for any plain error, whether or not brought to our attention or to the attention of the trial court. We have found no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phases of the trial.
We have also reviewed Sneed's sentence pursuant to §13A-5-53, which requires that, in addition to reviewing the proceedings for any error involving the conviction, we shall also review the propriety of the death sentence. This review shall include a determination of the following: (1) whether any error adversely affecting Sneed's rights was made in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in this case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and Sneed.
After Sneed was convicted of the capital offense charged, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46. After hearing evidence concerning aggravating and mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in finding aggravating and mitigating circumstances, to the weighing of those circumstances and to its responsibility in reference to the return of an advisory verdict, the jury, by a vote of 10 — 2, returned the following verdict: "We the jury recommend that the defendant, Ulysses Charles Sneed be punished by death." (R. 3946.) *Page 862 
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, to determine whether it would follow the jury's recommendation and sentence Sneed to death or to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b), and complied with the provisions of said section. After the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49 and the existence or nonexistence of any mitigating circumstance enumerated in §13A-5-51. It also made specific written findings as to the existence of additional mitigating circumstances referred to in §13A-5-52. It also made written findings of fact summarizing the crime and Sneed's participation in it. In its findings of fact, the trial court found the existence of the following aggravating circumstances: (1) that the capital offense was committed while Sneed was engaged in the commission of a robbery, § 13A-5-49(4); and (2) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, §13A-5-49(8). The trial court examined the evidence for mitigating circumstances, pursuant to § 13A-5-51, and found the existence of three: (1) that Sneed has no significant history of prior criminal activity, § 13A-5-51(1); (2) that Sneed was an accomplice in the capital offense committed by Hardy, §13A-5-51(4); and (3) that Sneed's age (23 years old) at the time of the crime, § 13A-5-51(7). In finding Sneed's participation as an accomplice to be a mitigating circumstance, the court noted that his participation was not minor and, thus, the court gave that mitigating circumstance very little weight. In finding his age to be a mitigating circumstance, the court noted that because he was 23 years old at the time the crime was committed, the court also gave that mitigating circumstance very little weight. The trial court also examined the evidence for additional mitigating circumstances referred to in § 13A-5-52, and found the existence of two nonstatutory mitigating circumstances: (1) Sneed's family, i.e, three children, three siblings, and his mother, by whom he was primarily raised; and (2) Sneed's character and remorsefulness for the murder.
Thus, the trial court found the existence of two aggravating circumstances and five mitigating circumstances. It considered the presentence report along with the advisory verdict of the jury and weighed the aggravating circumstances against the mitigating circumstances, and finding that the aggravating circumstances outweighed the mitigating circumstances, sentenced Sneed to death. Sneed was convicted of the offense of murder committed during a robbery in the first degree, § 13A-5-40(a)(2). This offense is defined by statute as a capital offense. We take judicial notice that similar crimes are being punished capitally throughout this state. See, e.g., McNair v. State, 706 So.2d 828 (Ala.Crim.App. 1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396 (1998); Hendersonv. State, 583 So.2d 276 (Ala.Crim.App. 1990), aff'd, 583 So.2d 305
(Ala. 1991), cert. denied, 503 U.S. 908 (1992); Kuenzel v. State,577 So.2d 474 (Ala.Crim.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886 (1991). In fact, two-thirds of Alabama's death sentences have been imposed on defendants convicted of capital murder arising out of murder-robbery. McNairv. State.
We have carefully searched the record of both the guilt and the sentence phases of Sneed's trial, and we have found no error warranting reversal. In reviewing the sentence, we find no evidence that the *Page 863 
sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. The trial court's findings and conclusions in support of the death sentence are supported by the evidence in the record. Furthermore, our independent weighing of the aggravating circumstances and the mitigating circumstances convinces us that death is the appropriate sentence in this case; therefore, we concur in the trial court's judgment. Considering the crime committed and considering Sneed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Accordingly, Sneed's conviction and sentence of death are due to be, and they are hereby, affirmed.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala. Code 1975.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, BASCHAB, and FRY, JJ., CONCUR.
[1] The mitigating circumstance set out in § 13A-5-51(4) is as follows: "The defendant was an accomplice in the capital offense committed by another person and his participation in it was relatively minor." Although the trial court found that Sneed wasnot a minor participant in the offense, the court specifically found this circumstance to apply to Sneed, because he was not the gunman. The court further found that this circumstance was entitled to very little weight in determining the appropriate punishment.
[2] This court has written:
 "After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless, if indeed it was. Chapman v. California, 386 U.S. 18 . . . (1967); Sattari v. State, 577 So.2d 535
(Ala.Cr.App. 1990), cert. denied, 577 So.2d 540
(Ala. 1991); A.R.App.P. 45. The harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241
(Ala. 1983); Henderson v. State, 583 So.2d 276
(Ala.Cr.App. 1990), aff'd, 583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908 . . . (1992); Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.), aff'd, 519 So.2d 586
(Ala. 1986), cert. denied, 486 U.S. 1036 . . . (1988). . . . In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not or probably did not injuriously affect the appellant's substantial rights."
Guthrie v. State, 616 So.2d 914, 931 (Ala.Cr.App. 1993), aff'd,689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135
(1997). See also Greathouse v. State, 624 So.2d 202 (Ala.Crim.App. 1992), aff'd, 624 So.2d 208 (Ala. 1993).