**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Francisco LOPEZ, Alberto Perdomo–Holquin, Defendants–Appellants.**

**No. 88–5290.**

United States Court of Appeals,
Eleventh Circuit.

April 25, 1990.

Chris Mancini, Miami, Fla., for Francisco Lopez.

L. Mark Dachs, and Debra Cholodofsky, Miami, Fla., for Alberto Perdomo Holquin.

Dexter W. Lehtinen, U.S. Atty., William F. Jung, Frank J. DiGiammarino, Mayra Lichter, and Linda Collins–Hertz, Asst. U.S. Attys., Miami, Fla., for the U.S.

Before KRAVITCH and JOHNSON, Circuit Judges, and KAUFMAN *, Senior District Judge.

JOHNSON, Circuit Judge:

Defendants appeal their convictions and sentences for conspiracy to possess cocaine with intent to distribute and for possession

* Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation.

of cocaine with intent to distribute in violation of 21 U.S.C.A. §§ 846 and 841.

## I. FACTS

### A. *Background*

On September 8, 1987, a container of balsa wood arrived in the Port of Miami from Ecuador. Drug Enforcement Administration ("DEA") and United States Customs agents searched the container and found approximately 400 pounds [1] of cocaine concealed in false compartments in the wood. The cocaine was wrapped in Ecuadorian newspapers. The agents decided to follow the cocaine and apprehend the importers. They left the cocaine in the false compartments and advised the trucking company waiting for the container that the container was ready for pickup.

On the morning of September 14, 1987, the trucking company picked up the container and delivered it to a mini-warehouse at 7882 Northwest 64th Street, near Miami.[2] A person later identified as Flores met the truck and had the container placed inside the warehouse. Flores remained at the warehouse until five that afternoon. He returned to the warehouse at seven that evening and left a short time later with a briefcase.

On the morning of September 15, 1987, Flores returned with five men. An agent observing the warehouse testified that he could hear the sounds of the men unloading the wood from the container. While the five men were unloading the container, Flores slowly drove his car around the warehouse parking lot. When the men were done, Flores closed the warehouse and left.

In the afternoon of September 16, 1987, defendant Alberto Perdomo–Holquin arrived and entered the warehouse. He met a truck from the trucking company, which took the empty container. Perdomo–Hol-

quin then waited at the warehouse. As he waited, he came out of the front and scanned the parking lot three times. At 2:10 p.m., Flores arrived. After 30 minutes, Flores placed a long box in the trunk of his car and left. A short time later, a trooper with the Florida Highway Patrol and a Customs agent stopped Flores under the pretext that he was a robbery suspect. After obtaining Flores's consent, the trooper searched Flores's car and found some sticks of balsa wood but no cocaine.[3] The trooper then allowed Flores to leave.

On the morning of September 17, Flores arrived at the warehouse at 10:15 a.m., and Perdomo–Holquin arrived at 11:30 a.m. At 1:00 p.m., defendant Francisco Lopez arrived. Lopez parked his car and walked around the parking lot with a cellular phone in his hand. He walked past a car from which an agent was observing the warehouse, looked around, and continued walking the parking lot. Lopez then returned the cellular phone to his car and went to a cafeteria across the street, where he stood in the doorway looking out at the warehouse and parking lot. He then walked to the warehouse and entered through the partially open bay door. Lopez left at 1:45 p.m. and Perdomo–Holquin left five minutes later. Flores locked up and left at 3:15 p.m.

At 5:00 p.m., Lopez returned to the area. He drove his car completely around the parking lot and parked by the office door to the warehouse. He checked the door and found that it was locked, so he drove away. He returned a few minutes later and parked across the parking lot from the warehouse in a lengthwise position that covered several spaces. From this position, Lopez could observe the entire area. Perdomo–Holquin arrived fifteen minutes later, opened the warehouse bay door, and allowed Lopez to back his car into the warehouse.

---

**1.** The exact weight was 195.7 kilograms.

**2.** Agents had learned in advance of the delivery address and were on the scene to observe the delivery. The warehouse consisted of twelve separately leased mini-warehouses, each with its own bay door and office door.

**3.** The agent testified that cocaine traffickers often conduct a "dry run" such as Flores's trip in order to detect any surveillance.

A few minutes later, the agents executed a search warrant. They drove up to the warehouse, exited their vehicles, announced that they were federal agents and that they had a search warrant, and took Perdomo–Holquin and Lopez into custody. The agents entered the warehouse through the open bay door and the unlocked office door. Inside the warehouse, they found Lopez near the front passenger door of his car. A bundle of balsa wood [4] was in the open trunk along with the cellular phone. There was an operating citizens' band radio on the roof of the car. An electronic bug detector capable of detecting police radios and police tape recording devices was located near the driver's door. An instruction manual to the bug detector lay open on the front seat of Lopez's car.

The agents found Perdomo–Holquin in an interior office. A desk in the office contained a beeper with three telephone numbers in its memory, including Lopez's cellular phone and Perdomo's residence. The agents seized the balsa wood and the cocaine, which was in the warehouse. They also seized Perdomo–Holquin's keys to the warehouse and some Ecuadorian newspapers that were dated within a couple of days of the newspapers seized earlier from the container at the Port of Miami.

Special Customs Agent Sanz took the following notes when Perdomo made a statement after his arrest:

> Perdomo stated that he had met his companion (referring to Lopez) in a disco and he (Perdomo) had been offered $100 per box by Lopez to move boxes. Perdomo said he had gotten the key from a male, whose name he did not know, but whom he referred to as an old man.[5] Perdomo said the old man just gave him the key to the warehouse. When Perdomo was

asked what he had been doing at the warehouse, on the prior occasions he stated, "just hanging around." When asked where he got his car, Perdomo said, "I don't know, the other guy [referring to Lopez] gave it to me and told me to drive it."

B. *Proceedings in the District Court*

A grand jury indicted Lopez and Perdomo–Holquin on three counts each.[6] Count one, which was later dismissed, was for conspiracy to distribute cocaine in violation of 21 U.S.C.A. §§ 841 and 846. Count two was for conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C.A. §§ 841 and 846 ("the conspiracy count"). Count three was for possession with intent to distribute in violation of 21 U.S.C.A. § 841 and 18 U.S.C.A. § 2 ("the possession count"). Perdomo–Holquin filed a pre-trial motion for severance, which the district court denied.

The district court held a jury trial from January 8 to 12, 1988. Lopez testified that he was a carpenter in Colombia and that he owned a furniture manufacturing company in Venezuela. He said that he came to the United States because "[a]s a spontaneous matter, I had been appointed as a news person, but pro bono for a magazine, and I supposed that perhaps I would be able to do something relating to horses...."[7] He stated that he had known Flores twenty years earlier in Colombia, that he met Flores by chance in the Dadeland Mall in Miami, and that Flores offered him the job moving wood. Perdomo–Holquin chose not to testify. The prosecution, however, offered a redacted version of Perdomo–Holquin's post-arrest statement as evidence against him.[8] The jury found both Lopez

4. This wood contained no cocaine.

5. Flores was an older man.

6. Flores was named as an unindicted co-conspirator.

7. Lopez testified that his sister owned a horse ranch.

8. The redacted statement was as follows:

> Perdomo stated that he had been offered $100 per box to move boxes. Perdomo said he had gotten the key from a male, whose name he did not know, but whom he referred to as an old man. Perdomo said the old man just gave him the key to the warehouse. When Perdomo was asked what he was doing at the warehouse on the prior occasions he stated "just hanging around." When asked where he got his car, Perdomo said, "I don't know, it was given to me and I was told to drive it."

and Perdomo–Holquin guilty on both counts.

In this appeal, we first consider (1) whether there was sufficient evidence to support the defendants' convictions, (2) whether the district court erred in denying Perdomo–Holquin's motion for severance because the omitted portions of his post-arrest statement were exculpatory, (3) whether the trial court erred in denying the defendants' motions to suppress evidence discovered in the warehouse search under 18 U.S.C.A. § 3109, (4) whether the district court erred in denying the defendants' motions for a mistrial based on the prosecutor's remark during closing argument, and (5) whether the district court erred in sentencing the defendants.

## II. ANALYSIS

### A. *Sufficiency of the Evidence*

■ Both defendants argue that the evidence was insufficient to support their convictions. This Court cannot reverse a conviction for insufficiency of the evidence unless after reviewing the evidence in the light most favorable to the government, we conclude that no reasonable jury could find proof beyond a reasonable doubt. *United States v. Bennett*, 848 F.2d 1134, 1138 (11th Cir.1988); *United States v. Petit*, 841 F.2d 1546, 1558 (11th Cir.1988). The evidence is sufficient even if it does not exclude every reasonable hypothesis of innocence. *Bennett*, 848 F.2d at 1138.

There is ample evidence to support these convictions. Both of the defendants engaged in activity from which the jury could reasonably infer a plan to remove the cocaine from the warehouse while avoiding detection by the authorities. The warehouse contained approximately 400 pounds of cocaine with a wholesale price of approximately $3 million. Both defendants conducted counter-surveillance measures, indi-

cating that they knew of the cocaine. Perdomo–Holquin watched for police surveillance as he waited for Flores on September 17, 1987.[9] Perdomo–Holquin also had the key to the warehouse, which indicates control over the warehouse and its contents. Perdomo–Holquin's home telephone number was in the beeper that the agents found in the warehouse office, indicating that he was in close contact with the holder of the beeper. Finally, the jury could have inferred guilty knowledge from Perdomo–Holquin's post-arrest statement. *See Bennett*, 848 F.2d at 1139 (jury may infer guilt from defendant's explanation of his activities). The jury reasonably could have interpreted Perdomo–Holquin's statement that he was to be paid $100 per box to move boxes as an indication that Perdomo–Holquin knew that drugs were involved. Perdomo–Holquin's explanation of where he got the warehouse key and the car was evasive, and the jury could have inferred guilt from this explanation. *See id.* (a defendant's implausible explanation may constitute positive evidence in support of a jury verdict).

Lopez's behavior in and around the warehouse was even more indicative of knowledge of the drugs. When Lopez first arrived at the warehouse on September 17, he engaged in an extensive search of the area before entering the warehouse. He walked the parking lot looking around and carrying a cellular phone. He went to the cafeteria and observed the scene for a minute before approaching the warehouse on foot. When he returned later that day, Lopez did not park in any of the open spaces near the warehouse door as he waited, but parked in a position where he could observe the entire area. The jury reasonably could have inferred from this evidence that Lopez was aware of the drugs and was engaging in counter-surveillance. When the agents entered the warehouse

At the close of evidence, Perdomo renewed his motion to sever on the ground that the redacted statement excluded exculpatory information: that Lopez was the one who offered him money and gave him the car.

9. Perdomo–Holquin argues that his standing in front of the warehouse and looking over the

parking lot could be interpreted as innocent anticipation of Flores's arrival. In reviewing the sufficiency of the evidence, however, we must draw all inferences in favor of the government. *Bennett*, 848 F.2d at 1139 n. 5.

they found Lopez apparently preparing for a second "dry run" designed to detect police surveillance. On top of Lopez's car was a citizens' band radio, and within a few feet of the car was an electronic bug detector. The directions to the bug detector were in Lopez's car. The jury reasonably could have inferred from this evidence of counter-surveillance that Lopez had knowledge of the cocaine and was participating in the conspiracy to distribute it. Finally, Lopez testified to an incredible story at trial in an effort to explain his association with Flores and his possession of the counter-surveillance devices. The jury reasonably could have inferred guilt from this implausible explanation. *Bennett,* 848 F.2d at 1139.

### B. *Severance*

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court held that admission of a non-testifying defendant's confession, implicating his co-defendant in the crime, violates the co-defendant's rights under the Confrontation Clause of the Sixth Amendment notwithstanding any cautionary instruction to the jury. *Id.* at 136, 88 S.Ct. at 1628. In *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), however, the Supreme Court held that the admission of a non-testifying defendant's confession does not violate the Confrontation Clause where the confession is redacted to eliminate the co-defendant's name and any reference to his existence and the court gives the jury a proper limiting instruction. *Id.* at 211, 107 S.Ct. at 1709. In the present case, the prosecution offered into evidence a redacted version of Perdomo–Holquin's statement in order to avoid violating Lopez's Sixth Amendment confrontation rights. Perdomo–Holquin argues that the language omitted from the statement tended to exculpate him, and that the district court denied him a fair trial by excluding this language from evidence. Perdomo–Holquin asserts that the district court should have granted his motion to sever his trial from Lopez's trial.

■ Federal Rule of Criminal Procedure 14 provides as follows: "If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires." This Court reviews the district court's denial of a motion for severance for abuse of discretion. *United States v. Bryan,* 843 F.2d 1339, 1341 (11th Cir.1988); *United States v. Casamayor,* 837 F.2d 1509, 1511 (11th Cir.1988). In order to demonstrate an abuse of discretion, Perdomo–Holquin must show specific and compelling prejudice against which the trial court was unable to afford protection. *Bryan,* 843 F.2d at 1341; *Casamayor,* 837 F.2d at 1511.

■ Perdomo–Holquin has failed to demonstrate compelling prejudice arising out of the redaction. The omitted portions of his post-arrest statement made clear that Lopez offered Perdomo–Holquin $100 per box to move boxes and that Lopez had given Perdomo–Holquin a car.[10] These portions tend to inculpate rather than exculpate Perdomo–Holquin on the conspiracy count because they show an agreement between Lopez and Perdomo–Holquin.[11]

10. Perdomo–Holquin argues that if the unredacted version of his statement was admitted he could have argued to the jury that because he moved only two boxes for Lopez in two days he was only being paid $100 per day. It is not clear how the redaction would have prevented Perdomo–Holquin from making this argument, and in fact he did make this argument during closing arguments. Accordingly, Perdomo–Holquin's rights were not prejudiced by this redaction.

11. Perdomo–Holquin argues that introduction of the redacted statement violated the "rule of completeness." *See United States v. Pendas-Martinez,* 845 F.2d 938, 944 (11th Cir.1988); *United States v. Smith,* 794 F.2d 1333, 1335 (8th Cir.1986) (when part of a defendant's post-arrest statement is introduced, the defendant generally has the right to have the entire statement introduced). Courts have recognized, however, that in cases where a redacted version of a statement is necessary to protect the rights of a co-defendant, "the rule of completeness will be violated only when the statement in its edited form ... effectively distorts the meaning of the statement or excludes information substantially exculpato-

Accordingly, Perdomo–Holquin's argument is meritless.

### C. *Knock and Announce Requirement*

■ The federal "knock and announce" statute, 18 U.S.C.A. § 3109, provides as follows:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C.A. § 3109. The defendants argue that the agents violated section 3109 by entering the warehouse without pausing to knock and announce their authority and purpose. This argument fails for two reasons. First, although the defendants assert that the agents entered the warehouse and announced themselves simultaneously, the record does not support their assertion.[12] Second, in *Fields v. United States,* 355 F.2d 543 (5th Cir.1966), this Court's predecessor held that section 3109 applies only to a house and its curtilage, and does not apply to commercial buildings. *Id.*[13] In the present case, the warehouse was a commercial building, and therefore section 3109 does not apply to the present case.

### D. *Prosecutorial Misconduct*

In his closing argument, Lopez's counsel reviewed the prosecution's actions in bringing the case against the defendants and argued that there were no real procedural safeguards protecting the defendants' rights until the case came to the jury. In rebuttal, the prosecutor said to the jury, "[l]adies and gentlemen, [Lopez's counsel] wants to portray that this was some wild accusation with no safeguards until we got in here. He didn't tell you that the magistrate had to find probable cause for an arrest warrant." The defendants objected to this statement and moved for a mistrial. The district court denied the motion, but sustained the objection and instructed the jury to disregard the prosecutor's statement.[14] The defendants argue that the prosecutor's comment implied that the government's case had judicial approval, prejudicing the defendants' case.

■ The prosecutor's remark was improper because it may have been interpreted as implying that the magistrate had reached a conclusion that the defendant was guilty before trial and that the jury could consider this in making its decision. *United States v. Stefan,* 784 F.2d 1093, 1100 (11th Cir.1986). Prosecutorial misconduct is a basis for reversing an appellant's conviction only if, in the context of the entire trial in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused. *United States v. Reed,* 887 F.2d 1398, 1402 (11th Cir.1989). A prejudicial remark may be rendered harmless by a curative instruction. *Id.*

---

ry of the nontestifying defendant." *Smith,* 794 F.2d at 1335 (internal quotations omitted). In the present case, the redacted statement neither distorted Perdomo–Holquin's meaning nor excluded exculpatory information.

12. The transcript provides as follows: "We [ [ (the agents) ] arrived at the location, exited our vehicles, announced that we were Federal agents, we had a search warrant, and we took Mr. Perdomo and Mr. Lopez into custody at that point." There is no indication that the agents entered the warehouse before announcing themselves.

13. *Fields* is binding precedent in this Circuit, *see Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), and only a decision by this Court sitting *en banc* or by the United States Supreme Court can overrule *Fields. See*

*United States v. Machado,* 804 F.2d 1537, 1543 (11th Cir.1986).

14. The court's instruction was as follows:

What has happened prior to this case getting to this courtroom for trial is absolutely immaterial from your standpoint in deciding the guilt or innocence of these defendants.

Your judgment is on the basis of what you have heard and seen in this courtroom. And it matters not what a magistrate did, it matters not from your standpoint what the grand jury did.

＊ ＊ ＊ ＊ ＊ ＊

The indictment is not evidence of anything. What the magistrate did is not evidence of anything.

■ In *Stefan,* the Court noted that the potential harm from the prosecutor's improper remark was mitigated by the jury's understanding that the prosecutor was countering defense counsel's attacks on the prosecution's integrity. *Stefan,* 784 F.2d at 1100 (citing *United States v. Young,* 470 U.S. 1, 17–18, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985)). In *Reed,* the Court did not reverse the appellant's conviction where the district court immediately made a curative instruction. *Reed,* 887 F.2d at 1402. In the present case, the prosecutor's remark occurred during rebuttal in response to improper remarks by the defense counsel and the district court immediately gave a curative instruction. Under these circumstances, the prosecutor's remark did not violate the defendants' substantial rights.

### E. *Sentencing*

#### 1. *Lopez*

■ On March 18, 1988, the district court held a sentencing hearing and sentenced Lopez to two concurrent twenty-year sentences, with a five year term of supervised release on the possession count.[15] The court found that "the testimony that [Lopez] gave in this courtroom was ludicrous.... If the defendant is going to take the witness stand and commit perjury, then he best hope that he gets acquitted, because in that respect he is going to suffer the consequences." The court stated that if Lopez had not perjured himself the court would have imposed a fifteen year sentence. Lopez argues that the district court erred in inferring from Lopez's testimony that Lopez committed perjury at his trial. In *United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), the Supreme Court held "the defendant's readiness to lie under oath—especially when ... the trial court found the lie to be flagrant—may be deemed probative of his prospects for rehabilitation." *Id.* at 52, 98 S.Ct. at 2616. The Court held that the sentencing judge could note its belief that the defendant perjured

himself and take that into account in sentencing. *Id.* at 45, 98 S.Ct. at 2613. Accordingly, Lopez's claim is meritless.

#### 2. *Perdomo–Holquin*

On February 7, 1986, Perdomo–Holquin was stopped by Customs officials and found to be in possession of $80,000 in cash. A Los Angeles Police Department narcotics-sniffing dog detected the smell of narcotics on the money. At the sentencing hearing in the present case, the district court said, "the court is of the view that Mr. Perdomo is a lot bigger player and is basing that judgment on the California matter...." The Court stated that it therefore was increasing Perdomo–Holquin's sentence from fifteen to twenty years. Perdomo–Holquin argues that the district court improperly inferred from the California incident that Perdomo–Holquin was a substantial player in the drug trafficking community.

■ The sole interest of the defendant in sentencing is the right not to be sentenced on the basis of inaccurate or unreliable information. *United States v. Giltner,* 889 F.2d 1004, 1008 (11th Cir.1989). As a corollary to this interest, a defendant should not be sentenced on the basis of groundless inferences. *See Roberts v. United States,* 445 U.S. 552, 563, 100 S.Ct. 1358, 1365, 63 L.Ed.2d 622 (1980) (Brennan, J., concurring). No limitation is placed on the information concerning the background, character, and conduct of a defendant that the sentencing judge may consider. *Id.* at 1007 (citing 18 U.S.C.A. § 3661). This court reviews the sentencing judge's inquiry for abuse of discretion. *Id.* at 1008–09; *United States v. Serra,* 882 F.2d 471, 474 (11th Cir.1989).

■ In the instant case, the government filed the affidavit of a Los Angeles County police officer and a Drug Enforcement Administration report to substantiate that Perdomo–Holquin was found in Los Angeles with $80,000 in cash. At the time

---

**15.** The federal sentencing guidelines do not apply to this case. *See United States v. Serra,* 882 F.2d 471, 473 (11th Cir.1989) (guidelines apply to crimes committed on or after November 1, 1987).

that the Los Angeles agents stopped him, Perdomo–Holquin stated that he had received the money from a stranger named "poncho" and that the money belonged to Perdomo's Colombian brother-in-law. He stated that he was taking the money to Miami to deposit in his brother-in-law's accounts in $6,000 to $7,000 increments. This information, coupled with Perdomo–Holquin's conviction of possession of 400 pounds of cocaine, reasonably gives rise to an inference that Perdomo–Holquin was a substantial member of the drug trafficking community. Accordingly, the district court did not abuse its discretion in considering this inference.

### III. CONCLUSION

We AFFIRM the convictions and sentences of both defendants.

AFFIRMED.