783 So.2d 863 (2000)
Ex parte Ulysses Charles SNEED.
(In re Ulysses Charles Sneed v. State).
1981660.
Supreme Court of Alabama.
June 30, 2000.
As Modified on Denial of Rehearing September 15, 2000.
*864 Joseph W. Propst II, Decatur; and Michael K. Congiardo, Hartselle, for petitioner.
Bill Pryor, atty. gen., and Michael B. Billingsley, asst. atty. gen., for respondent.
PER CURIAM.
Ulysses Charles Sneed was convicted of capital murder for the killing of Clarence Nugene Terry. The murder was made capital because it was committed during the course of a robbery in the first degree. See § 13A-5-40(a)(2), Ala.Code 1975. Sneed was tried with a codefendant, John Milton Hardy; Hardy also was convicted of capital murder. See Hardy v. State, [Ms. CR-95-0589, March 26, 1999] ___ So.2d ___ (Ala.Crim.App.1999). (Hardy's case is pending before this Court on certiorari review (no. 1981646).) The jury, by a vote of 10-2, recommended that Sneed be sentenced to death by electrocution. The trial court, after independently weighing the aggravating and mitigating factors, concurred with the jury's recommendation and sentenced Sneed to death.[1]
The Court of Criminal Appeals affirmed Sneed's conviction and sentence. See Sneed v. State, 783 So.2d 841 (Ala.Crim. App.1999). This Court granted Sneed's petition for certiorari review. Because we find that the trial court erred in admitting into evidence an edited and redacted version of a statement that Sneed had made to police officers, we reverse and remand.

I.
The record indicates the following facts.[2] On August 29, 1993, Sneed and Chris Hines drove from Louisville, Kentucky, to Alabama. The two men came to Alabama to look for jobs. Sneed stayed with Hines and Hardy, who is Hines's cousin. In the early morning hours of September 7, 1993, Sneed and Hardy borrowed Hines's automobile and went to buy beer; Hardy was driving and Sneed was a passenger. Hardy drove to his house, where he picked up a rifle and put it in the car. He then drove to Bud's Convenience Store in Decatur. Hardy pulled his shirt sleeves from his shirt, and Hardy and Sneed tied the sleeves around their faces as masks. Sneed opened the door to the convenience store. Hardy stepped into the store and began firing his rifle at Terry, the store clerk. Hardy's first shot missed Terry, who tried to hide behind the counter. As Hardy fired at Terry, Sneed ran behind the counter toward the cash register. While Sneed attempted to open the cash register, Hardy leaned over the counter and shot Terry in the chest. Hardy then walked around the counter and shot Terry five times in the head and face. While Terry lay dying on the floor, Sneed and Hardy continued their attempt to open the cash register; they were unsuccessful. Sneed and Hardy unplugged the cash register and took it with them as they ran from the store. These events were recorded on the convenience store's surveillance video camera.
Later that morning, Sneed, Hardy, and Hines went to Hardy's father's house, where Sneed and Hardy had left the cash register. Using a sledgehammer, the *865 three men tried to open the register. When the police recovered the cash register, they found Hines's fingerprint on it. The police showed the surveillance video to several people, including Hines. Four of those people, including Hines, identified Hardy as the shooter and Sneed as the unarmed man.
In his statement to police, Sneed admitted that he had participated in the robbery, but stated that he did not intend for anyone to get hurt. The indictment against Sneed alleged that he had committed the capital offense of murder during the course of a first-degree robbery, in violation of § 13A-5-40(a)(2), Ala.Code 1975. At his arraignment, Sneed pleaded not guilty.[3] At trial, Sneed's defense was that, although he had participated in the robbery, he was not the gunman and he did not intend that anyone be killed.

II.
In his petition for certiorari review, Sneed presents 14 issues for our review; however, we address only the issue whether the trial court erred in admitting into evidence Sneed's edited and redacted statement. Because Sneed and Hardy were tried together, the prosecution did not introduce into evidence the complete statement Sneed gave to police officers, but instead, introduced his statement in an edited and redacted form. In the edited and redacted version of the statement, in places where Sneed had actually said "we" or "he," the prosecution had substituted "I," and in addition, it had eliminated all references to Hardy. The prosecution used the edited and redacted statement in an effort to avoid violating Hardy's confrontation right guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constitution. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
In Bruton, the Supreme Court held that the admission of a non-testifying defendant's confession, implicating his codefendant in the crime, violated the codefendant's rights under the Confrontation Clause of the Sixth Amendment. 391 U.S. at 126, 88 S.Ct. 1620. See, also, United States v. Lopez, 898 F.2d 1505, 1510 (11th Cir.1990). However, in Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the Supreme Court limited its holding in Bruton, holding that the admission of a non-testifying defendant's confession does not violate the Confrontation Clause if the confession is redacted so as to eliminate the codefendant's name and any reference to his or her existence, and if the court gives the jury a proper limiting instruction. See Richardson, 481 U.S. at 208-09, 107 S.Ct. 1702.
As previously noted, the State chose to try Sneed and Hardy together. In order to have the benefit of Sneed's statement in the case against him without violating Hardy's rights, the State, over Sneed's objection, had the edited and redacted statement admitted into evidence. His statement, as edited and redacted, put him in the role of a sole actor in the events leading up to the murder. The statement Sneed gave to police officers states:
"On Sunday morning August 29, I was over at my friend Chris Hines House. Chris's girlfriend (Tanya Reed) was there with their kids. About a week before this we had planned to go to Alabama from Louisville, Kentucky. Anyhow Chris and his girlfriend got into an argument and Chris said man I'm ready to go are your clothes ready I told him no and he took me home to get some clothes and me and Chris left coming *866 to Alabama about 9:30 A.M. Eastern time. We arrived on Sunday the 29th of August about 3:30 PM. Central time, Alabama time. We drove to Mrs. Tina Gills place. That's were we had planned to stay because Chris's Mother didn't want Chris staying with his Daddy in Alabama because he was a bad influence. After we had been their a couple of days a tall fellow came over to Mrs. Gills his first name was John I don't remember his last name it was Hobby, Harbie or something like that. While we were there we went to A & M college, Huntsville, and to the Ebony Club in Triana. While we were at the Ebony Club John got into a fight. This was on friday night. We went back on Saturday night but we didn't have any trouble. On Labor Day we stayed around Mrs. Gills house. That night me and John ask Chris if we could use his car to make a liquor run. We went the county line and got a case of beer then we went to John's Mother's house and we got wasted on beer. Chris was at John's Mother's house when we borrowed the car. We got wasted drinking beer and John borrowed Chris's car again and me and him rode around. After a little while John said something about he shouldn't have let that guy take him. He was talking about the fight on friday night at the Ebony Club. John drove over to his house and he got out of the car and left it running and told me to wait a minute. I just sat in the car and in minute or so John came out and he had a rifle with a scope on it. He laid it in the back seat. We drove off. I don't know where we went because I'm not from there. I remember we rode on a lot of dirt roads. I remember crossing a draw bridge over a river. After crossing the bridge John said lets go get some money. He meant go strong arm somebody. We drove pass a lot of gas stations, I remember we went by about six. Most of them had several people there and John kept saying lets go someplace else. Sometime between 12:00 midnight and 12:30 I saw a station that had only one guy in it. John drove around the block twice. We drove through the front of the store and looked inside. Then we drove back by the front and I saw the store clerk in the back by the Pop machines. I mean by the place were you open the doors to get the pop out. We parked on the side of the store. I forgot to say that after we drove by the first time we stopped and John started to take his shirt. I remember he tore the sleeves off his shirt we were going to use them for mask to cover our faces. When we drove by the front of the store the second time, we stopped and got out and as we walked to the front doors we tied the mask on our face. Then we went in the store. I opened the door the next thing I knew John threw up the gun and started shooting. I ran pass John and tried to raise up the counter so I could get behind it but I couldn't get it up. I crawled under it. John leaned over the counter and the store clerk was trying to hide on the floor behind the counter John pointed the gun at the store clerk and he shot him in the shoulder. I was trying to get the cash register open. There was two cash registers but I couldn't get either one of them to open. John kept shooting the man. I heard about nine shots. John reached up under the counter and unplugged one of the cash registers and I picked it up and we both ran out of the store and go into Chris car which is a blue colored Ford LTD, 4 door. I not sure about the model but I think it's a 74. All I know for sure is its a 70's model. We drove back to Tanner and John hid the cash register in a wooded area and then John drove home and I drove Chris's car back *867 to Mrs. Gills house. The next morning about 8:00 or 8:30 me and Chris drove over to John's house. John and his daddy was arguing about the rifle. The last time I saw the rifle John got it out of the car when I dropped him that night of the robbery. Sometime around 1:00 P.M. John told me to take my clothes off and burn them. He told me to get the gas can by the porch. I did and we poured the gas on my clothes and burned them. John had started burning his clothes before I got my clothes changed. Around 2:30 P.M. we had left going over to John's mother's. John told Chris were to go and we drove and got the cash register. We all busted the cash register open, me, Chris and John. But we never told Chris where we had gotten the cash register or how we got it. We couldn't get the money drawer open and we had to shake it to get the money out. I remember we got $48.00 (forty eight dollars). Chris helped get the money out and John took all the money and we spent it all that on Beer and gas. All of this happened on Tuesday the day after Labor day. On Wednesday morning about 9:00 AM. we all left coming back to Louisville. Me, Chris and John. I never told Chris what happened and he never ask me. I have not seen Chris or John since I got back to Louisville about 2:30 PM Kentucky time when they dropped me off at my house. This statement was written by Sgt. Dwight Hale but the words and thoughts are my own and true to the best of my memory. I have made the statement of my own free will and no one force me to say anything."
State's Exhibit # 67 (misspelled and omitted words and grammatical and punctuation errors in original). However, the edited and redacted statement admitted into evidence at trial reads:
"On Sunday morning, August 29, I was over at my friend Chris Hines' house. Chris's girlfriend, Tonya Reed, was there with their kids. About a week before this, we had planned to go to Alabama from Louisville, Kentucky. Anyway, Chris and his girlfriend got into an argument and Chris said man I am ready to go, are your clothes ready? I told him no and he took me home to get some clothes and me and Chris left coming to Alabama about 9:30 a.m., eastern time. We arrived on Sunday, August 29, 1993, at about 3:30 p.m., central time, Alabama time. We drove to Ms. Tina Gill's place. That is where we planned to stay because Chris' mother did not want Chris to stay with his daddy in Alabama because he was a bad influence. While we were there, we went to A & M College, Huntsville into the Ebony club in Triana. We went back Saturday night, but we did not have any trouble. On labor day, we stayed around Ms. Gill's house. Chris was asked if his car could be used to make a liquor run. A case of beer was bought at the county line. I got wasted on beer. I rode around. I remember I rode on a lot of dirt roads. I remember crossing a draw bridge over a river. After crossing the bridge, I went past a lot of gas stations. I remember, I went by about 6. Most of them had several people there. Sometime between 12:00 midnight and 12:30 a.m., I saw a station that had only one guy in it. I went around the block twice. I went by the front of the store and I saw the store clerk in the back by the pop machines. I mean by the place where you open the doors to get the pop out. The car was parked on the side of the store. I used the sleeves from a shirt for a mask to cover my face. When I went by the front of the store the second time, I got out and walked to the front door. I tied the mask on my face and I went in the store. I opened the door and the next *868 thing I knew, the shooting started. I ran and tried to raise up the counter so I could get behind it, but I could not get it up. I crawled under it. I was trying to get the cash register open. There were two cash registers but I could not get either one of them to open. One of the cash registers, I picked up and ran out of the store and got in Chris' car which is a blue colored Ford LTD, 4 door. I am not sure about the model but I think it is a 74. All I know for sure is that it is a 70's model. I went back to Tanner and then I drove Chris' car back to Ms. Gill's house. I poured gas on my clothes and burned them. I went and got the cash register, busted it open, me and Chris, but I never told Chris where I had gotten the cash register or how I got it. I could not get the money drawer open and I had to shake it to get the money out. I remember, I got $48.00. Chris helped get the money out. We spent it all that night on beer and gas. All this happened on Tuesday, the day after labor day. On Wednesday morning, about 9:00 a.m., we left going back to Louisville, me and Chris. I never told Chris what happened and he never asked me. I have not seen Chris since I got back to Louisville about 2:30 p.m. Kentucky time when he dropped me off at my house."
State's Exhibit # 69 (omitted words and grammatical and punctuation errors in original).
Sneed's defense at trial was that he had participated in the robbery, but not the murder; that he was one of the people shown on the videotape, but he was not the gunman; and that he did not intend for anyone to be killed during the robbery. He argues that "[t]he redacted statement distorted the facts of the case and enlarged [his] role in the offense, effectively nullifying [his] defense that he lacked the specific intent to commit murder." The redaction of his statement was prejudicial, Sneed says, because the full statement was consistent with, and supportive of, his theory of the case, while the redacted statement was factually incorrect and made it appear that he alone had planned the robbery and was the sole active participant in it. Sneed maintains that the redaction in this case served to protect the rights of his codefendant, Hardy, while it distorted the facts presented to the jury; therefore, he concludes, the redaction was so prejudicial that the trial court should not have admitted it into evidence.
Sneed also argues that the redaction of his statement violated the rule of completeness, i.e., the rule that "[c]onfessions or declarations, whether offered in evidence in a civil or criminal case, must be received as a whole." Eiland v. State, 52 Ala. 322, 335 (1875); accord Levy v. State, 49 Ala. 390, 393 (1873) ("The whole of a confession or admission must be given in evidence, and taken together; in other words, it must not be garbled."). Finally, Sneed points out that "[t]he right of cross examination, thorough and sifting, belongs to every party as to the witnesses called against him" (quoting § 12-21-137, Ala. Code 1975), and argues that the redaction of his statement unlawfully limited his right to cross-examine the police officer who took the statement, because he could not ask the officer questions that elicited references to Hardy's involvement in the crime.
The State argues that the admission of the edited and redacted statement did not hamper Sneed's ability to put forth a defense because, it says, Sneed had the benefit of the videotape evidence from the store's surveillance camera, he had the opportunity to cross-examine two police officers, and the trial court instructed the jury that his statement, as introduced, was incomplete. The State also argues that the admission into evidence of the statement *869 did not violate the rule of completeness, relying upon United States v. Long, 900 F.2d 1270, 1279 (8th Cir.1990). Long held that the rule requiring completeness of a statement by an accused does not apply when the meaning of a redacted statement is clear despite the redaction. The State's argument ignores the reality that the redaction in this case made a liar out of Sneed.
The jurors, who heard only the edited and redacted statement, heard Sneed describe himself as the central figure in the crime, without reference to the participation of anyone else in the events leading up to the murder, such as driving the car, obtaining the murder weapon, passing six gasoline stations before settling on the scene of the crime, or making a mask from shirt sleeves. It appears from the statement that Sneed drove the car, obtained the murder weapon, drove past six stations looking for the easiest target, devised the means of making the masks, and induced Hardy to carry the weapon into the store.
At trial, however, Sneed's theory of defense was irreconcilably inconsistent with the edited and redacted statement. Although the videotape evidence from the surveillance camera and Sneed's cross-examination of the two officers supported his defense at trial, the videotape and the officers were incompetent witnesses as to the aforementioned events leading up to the murder. The videotape showed that Sneed was not acting alone and that Sneed was not the gunman; however, even though it provided a remarkable amount of evidence, it was simply unable to capture Sneed's intent at the time Sneed and Hardy entered the store. Evidence from the videotape and the officers does not overcome the distorted statement's contradiction of Sneed's defense that he lacked the specific intent to commit murder.
Although the police officers and the trial court told the jury that the edited and redacted statement was not Sneed's entire statement, its inconsistency with his defense at trial was not cured by so informing the jury. The police officers testified on cross-examination that Sneed had told them that he did not intend for anyone to die, that he was unarmed, and that he had no role in the murder. The State contends that the officers' testimony provides the "completeness" to the statement that was missing because of the redaction. However, that testimony contradicts the logical inference that Sneed's role in the offense, as described in the edited and redacted version of the statement made available to the jury, was primary. The jury could simply have believed that Sneed said one thing to the officers and another in his written statement.
The State recognizes in its brief that this Court has not previously addressed how the doctrine of completeness applies to a statement edited and redacted in accordance with Richardson, supra. Other jurisdictions have addressed this issue, however, as the Court of Criminal Appeals in its opinion and the State in its brief have noted. The United States Court of Appeals for the Second Circuit has acknowledged that a district court, in deciding whether to redact portions of a defendant's statement, must balance its interest in protecting a codefendant's Sixth Amendment confrontation right against its interest in the judicial economy that is promoted by trying two or more defendants together. United States v. Mussaleen, 35 F.3d 692 (2d Cir.1994); United States v. Castro, 813 F.2d 571 (2d Cir.), cert. denied, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). The Second Circuit has applied an abuse-of-discretion standard when reviewing a district court's balancing of these competing interests. Mussaleen, 35 F.3d at 696; Castro, 813 F.2d at 576. See, also, State v. Mahboubian, 74 N.Y.2d 174, 543 N.E.2d 34, 544 N.Y.S.2d *870 769 (1989) (the trial court's redaction of a statement and the denial of a severance were reviewed for abuse of discretion).
In Mussaleen, the district court had redacted portions of defendant McKinnon's pretrial statement in an effort to protect his codefendant Mussaleen's Sixth Amendment confrontation right. McKinnon argued that the redaction distorted his statement and that it violated the rule of completeness. The Second Circuit concluded that the redacted version of McKinnon's statement did not unfairly distort the original and did not exclude exculpatory information. The Second Circuit also concluded that because the redacted version of the statement conveyed the substance and context of the statement as a whole, it did not offend the rule of completeness. It found that the district court had not abused its discretion in redacting portions of McKinnon's statement. 35 F.3d at 696.
In Castro, the district court had redacted the portion of defendant Castro's statement that attributed the ownership of a bag of cocaine to a codefendant. The Second Circuit held that even though the meaning of Castro's statement was changed "somewhat" by the redaction, the district court had not abused its discretion by redacting the statement and suggesting that on cross-examination of a law enforcement officer Castro could present to the jury the point that he denied ownership of the cocaine.
In Mahboubian, however, the Court of Appeals of New York found that Mahboubian had suffered undue prejudice as a result of the trial court's redaction of large portions of the statement he had made to police officers. Approximately 58 of 146 pages were redacted, eliminating all references to Mahboubian's codefendant Sakhai. In concluding that the trial court had abused its discretion by substantially redacting the statement, the Court of Appeals said that the redacted material "supported Mahboubian's defense arguments and if believed, it explained much of the evidence against him." 74 N.Y.2d at 188, 543 N.E.2d at 41, 544 N.Y.S.2d at 776.
The United States Court of Appeals for the District of Columbia Circuit has held that the "redaction of a confession violates the rule of completeness only if the redacted version `distorts the meaning of the statement or excludes information substantially exculpatory of the defendant.'" See United States v. Washington, 952 F.2d 1402, 1404 (D.C.Cir.1991), cert. denied, 503 U.S. 1009, 112 S.Ct. 1773, 118 L.Ed.2d 432 (1992) (quoting United States v. Kaminski, 692 F.2d 505, 522 (8th Cir.1982)). In Washington, however, the Court concluded that because the defendant was able to present during cross-examination the allegedly exculpatory material redacted from his statement, he was not denied "`"a meaningful opportunity to present a complete defense."' Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984))." Washington, 952 F.2d at 1404.
We now apply the foregoing legal principles to the case before us. Sneed's jury would have had to conclude that the edited and redacted version of his statement admitted at trial was untruthful in order to accept his defense that he lacked the specific intent to commit murder. In this respect, Sneed's rights were sacrificed in order to accommodate the State's interest in conducting a joint trial.
It is axiomatic that an admissible confession is a voluntary statement by the defendant waiving his privilege under the Fifth Amendment to the United States Constitution against being compelled to be a witness against himself. The scope of the waiver must be measured by the *871 words used in his voluntary act-i.e., his confession. Here, Sneed voluntarily gave a statement, but the State's significant and prejudicial alteration of the import of that statement effectively compelled his testimony as to matters to which he did not agree when he gave his statement.
We recognize that the trial court was attempting to perform the difficult task of balancing Sneed's right to offer his statement in support of his theory of defense, Hardy's Sixth Amendment right to confrontation, and the interest of judicial economy. In this instance, however, Sneed's statement was edited and redacted to the point that it was unduly prejudicial to him; therefore, the trial court abused its discretion in admitting into evidence Sneed's edited and redacted statement. Given the circumstances of this case, we conclude that Sneed is entitled to a new trial.

III.
We reverse the judgment of the Court of Criminal Appeals and remand the cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, COOK,[*] LYONS, JOHNSTONE, and ENGLAND, JJ., concur.
HOOPER, C.J.,[*] and MADDOX, SEE, and BROWN, JJ., dissent.
SEE, Justice (dissenting).
Having reviewed the record in this case, I must respectfully dissent. I would affirm Sneed's conviction and sentence.
Rule 13.3(a)(1), Ala.R.Crim.P., provides that "[t]wo or more offenses may be joined in an indictment, information, or complaint, if they ... [a]re of the same or similar character." Rule 13.4(a), Ala. R.Crim.P., provides that "the court may order an election or separate trials of counts [or] grant a severance of defendants" when "it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants," but the preference for joint trials was stated in Richardson v. Marsh, 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987):
"It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."
(Footnote omitted.) Because of these benefits, the use of joint trials has been repeatedly approved. See Zafiro v. United States, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).
The preference for joint trials and the interests of judicial economy must be balanced against the court's interests in protecting a codefendant's right of confrontation. In Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court of the United States held that the admission into evidence of a *872 nontestifying defendant's confession, implicating his codefendant in the crime, violated the codefendant's rights under the Confrontation Clause of the Sixth Amendment. 391 U.S. at 126, 88 S.Ct. 1620. See also United States v. Lopez, 898 F.2d 1505, 1510 (11th Cir.1990). However, in Richardson v. Marsh, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the Supreme Court limited Bruton, holding that the admission of a nontestifying defendant's confession does not violate the Confrontation Clause if the confession is redacted to eliminate the codefendant's name and any reference to his existence, and the court gives the jury a proper limiting instruction. See Richardson, 481 U.S. at 208-09, 107 S.Ct. 1702.
The decision to grant a severance lies within the broad discretion of the trial court, and such a decision will not be overturned absent an abuse of that discretion. See Hill v. State, 481 So.2d 419, 424 (Ala. Crim.App.1985); Ex parte Washington, 562 So.2d 1304, 1305 (Ala.1990); Greathouse v. State, 624 So.2d 202, 204 (Ala. Crim.App.1992). For a defendant to establish an abuse of discretion, he "`must show that he "received an unfair trial and suffered compelling prejudice against which the trial court was unable to afford protection."'" Hill, 481 So.2d at 424 (citations omitted).
"`It is only the most compelling prejudice, against which the trial court will not be able to afford protection, that will be sufficient to show the court abused its discretion in not granting a severance. Moreover, a defendant seeking to overturn a denial of severance must demonstrate specific prejudice which resulted from the denial. A mere showing of some prejudice is insufficient.'"
Minnis v. State, 690 So.2d 521, 525 (Ala. Crim.App.1996), quoting Hinton v. State, 548 So.2d 547, 555 (Ala.Crim.App.1988), aff'd, 548 So.2d 562 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989) (citations omitted).
Although Sneed's original statement was altered by the redaction, the substance of the redacted material was presented to the jury through the testimony of other witnesses, through demonstrative evidence, and through facts elicited on cross-examination. Sneed's defense was that, although he was aware that he and Hardy were going to rob the convenience store, he did not intend for anyone to die. His defense was presented to the jury through the surveillance camera videotape and through Sneed's cross-examination of Officers Boyd and Hale. The video showed that Sneed was not acting alone and that Sneed was not the gunman. The trial court provided Sneed with wide latitude on cross-examination of the State's witnesses. On cross-examination, Officers Boyd and Hale testified that the statement admitted into evidence was not Sneed's entire statement; that Sneed told them that he had not intended for anyone to die; and that he was unarmed and had had no role in the murder. Moreover, the trial court instructed the jury that the redacted statement was not Sneed's entire statement. Based on the foregoing evidence, I cannot conclude that Sneed's ability to put forth a defense was hampered.
Sneed also argues that the admission of the redacted statement violated the rule of completeness. The general rule on this issue is that "when part of a defendant's post-arrest statement is introduced into evidence, the defendant has the right to have the entire statement introduced." United States v. Smith, 794 F.2d 1333, 1335 (8th Cir.1986); see also Bridges v. State, 516 So.2d 895 (Ala.Crim.App.1987). This rule, however, is not absolute. When a defendant's confession is redacted to avoid violating the Sixth Amendment rights of a codefendant, "`the rule of *873 completeness is violated, and severance required, only where admission of the statement in its edited form distorts the meaning of the statement or excludes information substantially exculpatory of the declarant.'" United States v. Long, 900 F.2d 1270, 1279 (8th Cir.1990), quoting United States v. Kaminski, 692 F.2d 505, 522 (8th Cir.1982). See also United States v. Smith, 794 F.2d 1333, 1335 (8th Cir.1986); United States v. Lopez, 898 F.2d 1505, 1510 n. 11 (11th Cir.1990). Although the redaction did edit Sneed's statement, the meaning of that statement became apparent through the testimony of witnesses, both on direct and on cross-examination, and through demonstrative evidence, including the surveillance videotape of the crime. "The rule of completeness is not violated when the meaning of the redacted statement becomes clear despite the redaction." Long, 900 F.2d at 1279.
Finally, Sneed argues that the admission of the redacted statement limited his ability to cross-examine witnesses. I do not find this argument persuasive, given the wide latitude afforded Sneed by the trial court.
After examining both Sneed's arguments and the record, and after reviewing the trial court's balancing of the competing interests of protecting a codefendant's confrontation right against the interest in judicial economy, I would hold that the trial court did not abuse its discretion in admitting into evidence Sneed's redacted statement. The admission of the redacted statement did not hamper Sneed's ability to put on his defense, did not violate the rule of completeness, and did not limit his ability to cross-examine witnesses.
HOOPER, C.J., and MADDOX, J., concur.
BROWN, Justice (dissenting).
I dissent not only for the reasons stated in Justice See's dissent, but also because I believe Judge Patterson was correct in his statement regarding harmless error:
"Moreover, in this case, even if the admission of Sneed's redacted statement was erroneous, it would not mandate reversal; the evidence of guilt of the capital crime charged was so overwhelming that any error in this regard would have been harmless. If error occurred, it could not have had an injurious effect or influence on the jury's verdict nor could it have injuriously affected Sneed's substantial rights."
Sneed v. State, 783 So.2d 843, 852 (Ala. Crim.App.1999) (footnote omitted).
I would therefore affirm Sneed's capital-murder conviction and the sentence.

On Application for Rehearing
PER CURIAM.
APPLICATION OVERRULED; OPINION OF JUNE 30, 2000, MODIFIED.
HOUSTON, COOK, LYONS, JOHNSTONE, and ENGLAND, JJ., concur.
HOOPER, C.J., and MADDOX, SEE, and BROWN, JJ., dissent.
HOOPER, Chief Justice (dissenting).
I must respectfully dissent. The majority concludes that "the redaction in this case made a liar out of Sneed," 783 So.2d at 869, and prevented him from effectively presenting the defense that he lacked the specific intent to kill. However, the redaction did not make a liar out of Sneed. The evidence did. Aside from the allegedly improperly redacted statement, the videotape from the security camera, the testimony from Sneed's cross-examination of the two police officers who recorded his original statement, and the trial court's instruction to the jury that the statement, *874 as introduced in its redacted form into evidence, was not his original, complete declaration provided ample opportunity for Sneed to present his defense. It was solely for the consideration of the jury, which heard firsthand the testimony, observed the evidence, and witnessed the events as they unfolded in the courtroom, to weigh that evidence accordingly; this Court is wrong to question the jury's determination in that regard.
My conclusion in this particular case does not undermine my firm belief that the state should be especially careful when redacting an accused's statementespecially as in the instant case, where pronouns are "blanketly" substituted to omit any mention of a coconspiratorlest it accidentally omit proof of the substantive elements of an offense. However, in this case, any error that may have inadvertently occurred in the admission of the redacted statement into evidence could be interpreted as harmless in light of the other, significant evidence presented by the state, which could have been interpreted by the jury as negating Sneed's defense that he lacked the specific intent to kill.
I would, therefore, affirm the judgment of the Court of Criminal Appeals affirming Sneed's capital-murder conviction and his sentence.
NOTES
[1] By the same vote of 10-2, the jury recommended that Hardy be sentenced to death. The trial court also concurred with the jury's recommendation as to Hardy and sentenced him to death.
[2] These facts were obtained both from the evidence presented at trial and from Sneed's unredacted statement.
[3] Sneed also pleaded not guilty by reason of mental disease or defect. However, Sneed withdrew this plea at trial following opening statements.
[*] Although Chief Justice Hooper and Justice Cook did not sit at oral argument of this case, they have listened to the tape of oral argument.